UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SILVA SWINTON, JOSEPH SWINTON, SILVA
SWINTON as parent for ELIANNA ("ICE")
SWINTON (infant) and SILVA SWINTON
as parent for ELIAN ("INI") SWINTON (infant),

                      **MEMORANDUM & ORDER**

             Plaintiffs,

                      08 CV 3278 (RJD) (RML)

          -against-

THE CITY OF NEW YORK, QUEENS COUNTY
DISTRICT ATTORNEY RICHARD BROWN,
ASSISTANT DISTRICT ATTORNEY ERIC
ROSENBAUM, ASSISTANT DISTRICT
ATTORNEY MARJORY FISHER, DETECTIVE
JANET BARRY and POLICE OFFICERS JOHN
DOE (1), JOHN DOE (2) and JOHN DOE (3),

             Defendants.
-----------------------------------------------------------------X
DEARIE, Chief Judge.

Plaintiffs bring claims under 42 USC §§ 1983, 1985 and 1986, and New York State law, arising from plaintiffs' arrest and conviction on charges relating to the severe malnutrition of their newborn infant. Defendants move to dismiss plaintiffs' First Amended Complaint (the "Amended Complaint" or "AC") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the following reasons, defendants' motion to dismiss is granted and plaintiffs' Amended Complaint is dismissed with prejudice.

**I.    Background.**

As this case has been the subject of extensive prior judicial proceedings and media reporting, the parties tend to agree on the relevant facts.[1] As always, where accounts diverge, the Court will accept the Amended Complaint's allegations as true and resolve all reasonable

---

[1] In their opposition brief, plaintiffs adopt the facts as recounted in defendants' memorandum of law and supporting exhibits. (Pls' Opp., Dkt. #39, at 2.)

1

inferences in plaintiffs' favor for purposes of this motion. See, e.g., Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 320 (2d Cir. 2009).

A.  The Swintons' arrest.

On July 31, 2000, Ice Swinton ("Ice") was born to Joseph and Silva Swinton. At birth, Ice weighed less than three pounds. From birth, the Swintons fed Ice what they believed to be a strict vegan diet.[2] On or around November 16, 2001, after several anonymous calls to the Administration of Child Services ("ACS") which the Swintons later discovered were made by Ice's aunt, Emergency Medical Technicians removed Ice from her parents' home in Queens and brought her to the hospital. Doctors observed that Ice, then sixteen months old, had low levels of vitamin D and calcium, resulting in rickets, and suffered from severe malnutrition. Up to that point, the Swintons had never taken Ice to a doctor despite the baby's noticeable developmental delays, soft spot on the skull, complete lack of teeth and abnormal amount of body hair. "[T]he strict vegetarian diet provided by the defendants was to blame for Ice's many maladies." People v. Swinton ("Swinton I"), 21 A.D.3d 1039, 1041 (2d Dep't 2005) (Miller, J., dissenting in part).

Ice spent the next five months recovering in various hospitals. During this time, the Swintons consulted with ACS representatives about regaining custody of Ice. Pursuant to ACS's instruction, the Swintons enrolled in parenting and nutrition classes and programs. During the same five-month period, Queens County Assistant District Attorneys ("ADAs") Eric Rosenbaum and Marjory Fisher and New York City Police Department ("NYPD") Detective Janet Barry, all now defendants, investigated the Swintons' treatment of Ice. ACS eventually recommended that the District Attorney's ("DA's") Office not pursue criminal charges due to the Swintons' absence of history with ACS and apparent lack of desire to harm their child. Of the witnesses

---

[2] Simply defined, veganism is the practice of avoiding the use or consumption of non-human animal products. Ice's diet included beans, peas, nuts and cod liver oil, but no milk, eggs or meat of any kind.

2

interviewed as part of the investigation, none professed a belief that the Swintons had intended to harm Ice.

On April 25, 2002, at approximately 9:00 p.m., Detective Barry arrested the Swintons at their home. According to the Amended Complaint, Detective Barry, acting without a warrant, initially informed Mr. Swinton that the NYPD was investigating a reported domestic violence incident. Mr. Swinton denied that such an incident had occurred and refused the Detective entry. Ms. Swinton then came to the door to confirm that no domestic violence had taken place. After the Detective twice more requested to enter the house, Mr. Swinton, allegedly feeling intimidated, "believed he had no choice but to comply." (AC ¶ 31.) Detective Barry and the other officers entered and, according to the Amended Complaint, searched the premises before demanding that the Swintons produce Ice. The Swintons replied "that infant Ice was not on the premises and that in fact she had been removed from the home and [had been] at the hospital" for the past five months. (Id. ¶ 34.) After Detective Barry allegedly called the DA's Office for instructions, the officers arrested the Swintons, brought them to the precinct house and charged them with first-degree assault, first-degree reckless endangerment and endangering the welfare of a child.

That same evening, Queens DA Richard Brown held a press conference to announce the arrest. During the press conference, which was widely reported on television and radio stations, DA Brown showed the Swintons' arrest photos, called the Swintons "monsters" and reported "that he had full knowledge and supported the arrest and charges" of the Swintons. (Id. ¶ 39.)

B. The Swintons' indictment, conviction and appeal.

The Swintons were arraigned the day after their arrest. The Amended Complaint alleges that during the grand jury proceedings, ADA Rosenbaum "deliberately and knowingly

3

misstate[d] and withh[e]ld pertinent information" by not allowing Detective Barry "to state the cause, basis or justification of the [Swintons'] arrest." (Id. ¶ 46.) The grand jury indicted the Swintons and, on April 4, 2003, a jury convicted the Swintons of all three charges. As a result, Ms. Swinton received a sentence of six years in prison; Mr. Swinton, five years.

On September 19, 2005, the Appellate Division (by a 4-1 vote) affirmed the jury verdict but vacated the conviction for "reckless endangerment in the first degree [a]s a lesser-included offense of assault in the first degree."[3] Swinton I, 21 A.D.3d at 1040. On July 6, 2006, the New York Court of Appeals modified that decision by "reducing defendants' convictions for assault in the first degree to assault in the third degree." People v. Swinton ("Swinton II"), 7 N.Y.3d 776, 777 (2006). Citing to its holding a day earlier in People v. Feingold, 7 N.Y.3d 288 (2006) (ruling that depraved indifference to human life, rather than recklessness, is the applicable mens rea in statutes in which the former appears), the Court of Appeals found the evidence "legally insufficient to prove beyond a reasonable doubt that defendants acted with the culpable mental state of depraved indifference." Swinton II, 7 N.Y.3d at 777. The Court of Appeals found the evidence "legally sufficient, however, to support the jury's determination that defendants acted recklessly." Id. On July 18, 2006, the Swintons were released from prison. In November 2008, the Swintons regained custody of Ice.

C.  The ensuing civil proceedings.

On October 16, 2007, plaintiffs sought leave from New York Supreme Court to file a late notice of claim pursuant to New York General Municipal Law § 50-e(5), as the 90-day post-accrual period for notifying New York City and its employees of tort claims had elapsed.

---

[3] In New York, "[a] person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal Law § 120.25. First-degree assault requires that this same conduct "cause[] serious physical injury to another person." Id. § 120.10(3).

4

The proposed notice of claim alleged physical and emotional injuries stemming from "'civil rights violations'" including "false arrest, false imprisonment and malicious prosecution." Swinton v. City of New York ("Swinton III"), 61 A.D.3d 557, 557 (1st Dep't 2009). The Supreme Court denied plaintiffs' request to file the late notice. Affirming the denial, the Appellate Division recited that "[l]eave to file a late notice of claim should be denied where the claims are 'patently meritless.'" Id. (quoting Catherine G. v. County of Essex, 3 N.Y.3d 175, 178 (2004)). The Appellate Division then held that "[t]o the extent the subject notice of claim alleged false arrest and imprisonment and malicious prosecution, these claims are not viable in light of petitioners' conviction of assault in the third degree." Id.

### D. Plaintiffs' claims.

In the Amended Complaint, plaintiffs assert claims under 42 U.S.C. §§ 1983, 1985 and 1986 based on unlawful search and seizure, false arrest and malicious prosecution,[4] including conspiracies to commit these offenses, in violation of plaintiffs' rights under the Fourth Amendment and Equal Protection Clause. (Counts I to III.) Plaintiffs also bring a claim against New York City for inadequate training or supervision of its officers. (Counts IV and V.) Further, the Swintons claim that defendants' displaying their likenesses and making allegedly defamatory statements a press conference violated their civil rights. (Count VI.) Finally, plaintiffs bring claims under New York law against all defendants for malicious prosecution, intentional infliction of emotional distress and deprivation of society, services, companionship and consortium. (Counts III, VII and VIII.)

## II. Discussion.

"[A] complaint is insufficient as a matter of law unless it pleads specific facts that 'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[4] Plaintiffs withdrew their claims for abuse of process and abuse of authority.

alleged.'" Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 188 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)). "'Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Ruston v. Town Bd., 610 F.3d 55, 58 (2d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950). In making this determination, a court may take judicial notice of prior state court proceedings. See, e.g., United States v. Alexander, 123 F. App'x 444, 445 (2d Cir. 2005).

  A. Individual defendants' liability.
    i. ADAs Rosenbaum and Fisher.

Plaintiffs allege that ADAs Rosenbaum and Fisher violated plaintiffs' civil rights by "trespass[ing] upon and search[ing]" the Swintons' home "without a warrant," (AC ¶ 57), "falsely arrest[ing]" the Swintons "without a justifiable basis," (id. ¶ 62), and "wrongly overcharg[ing]" the Swintons "with the intent to maliciously prosecute them," (id. ¶ 66). Plaintiffs also allege that the ADAs conspired with others to commit these same offenses.

The ADAs are absolutely immune from liability for malicious prosecution. "It is well-settled that prosecutors performing prosecutorial activities that are 'intimately associated with the judicial phase of the criminal process' are entitled to absolute immunity from an action for damages under § 1983." Ying Jing Gan v. City of New York, 996 F.2d 522, 530 (2d Cir. 1993) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). "A prosecutor thus has absolute immunity in connection with the decision whether or not to commence a prosecution," and for the "decision as to what offenses are and are not to be charged." Id. Therefore, the ADAs' decisions to bring child endangerment charges against the Swintons are "plainly decisions as to which [the ADAs] are entitled to absolute immunity." Id.

6

Plaintiffs argue that the ADAs possess only qualified immunity to the extent that they "advised and took part in the investigation, and instructed defendant police officers on the search of the Swinton home and arrest of" the Swintons. (Pls' Opp., Dkt. #39, at 16.) Specifically, plaintiffs allege that, immediately before arresting the Swintons, "Detective Barry called the [DA]'s Office inquiring on how to proceed." (AC ¶ 35.) Construed in plaintiff's favor, this allegation suggests that either or both ADAs directed the Swintons' warrantless arrest, a police function to which the Second Circuit has held only qualified immunity might attach. See Day v. Morganthau, 909 F.2d 75, 78 (2d Cir. 1990) (denying absolute immunity to a prosecutor who "may have participated in 'executing [plaintiff's] arrest'"). On these facts, however, the ADAs' directing the Swintons' arrest was "so closely related to the prosecutorial decision itself as to warrant absolute immunity."[5] Ying Jing Gan, 996 F.2d at 531 (holding that a prosecutor is absolutely immune for "inform[ing] the police as to what charges would or would not be lodged").

Indeed, courts have denied prosecutors absolute immunity only for initiating arrests "without probable cause." Id.; see also Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."); Hill v. City of New York, 45 F.3d 653, 662 (2d Cir. 1995) ("Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts."). Here, the Amended Complaint itself makes clear that Detective Barry, whether acting independently or at the ADAs' direction, possessed probable cause to arrest the Swintons in November 2001, after EMTs first witnessed Ice in her sickly condition. Following a lengthy investigation, the Swintons' arrest in

---

[5] Even were the ADAs entitled only to qualified immunity for their pre-arraignment conduct, plaintiffs' claims for false arrest and unlawful search and seizure fail as a matter of law.

April 2002 merely commenced formal legal proceedings. For authorizing an arrest indisputably based on probable cause, prosecutors are entitled to absolute immunity. See Powers v. Coe, 728 F.2d 97, 104 (2d Cir. 1984) (denying the existence of "bright lines between quasi-judicial absolutely immune conduct, on the one hand, and investigative and administrative qualifiedly immune behavior, on the other").

The ADAs' pre-arrest investigation into the Swintons' treatment of Ice similarly cannot give rise to § 1983 liability. Plaintiffs do not implicate either ADA in misconduct, such as fabricating evidence, during the course of the investigation. Plaintiffs allege simply that ADA Rosenbaum refused to allow Detective Barry to "state the cause, basis or justification of the [Swintons'] arrest" before the grand jury. (AC ¶ 46.) The Second Circuit, however, has "consistently stated that prosecutors are immune from §1983 liability for their conduct before a grand jury." Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995).

In light of the above, the § 1983 conspiracy claims against the ADAs cannot survive, as "even a conspiracy among prosecutors is shielded by absolute immunity." Pinaud v. County of Suffolk, 52 F.3d 1139, 1148 (2d Cir. 1995) ("[W]hen the underlying activity at issue is covered by absolute immunity, the 'plaintiff derives no benefit from alleging a conspiracy.'" (quoting Hill, 45 F.3d at 659)).

    ii.    DA Brown.

All claims against Queens DA Richard Brown in his official capacity are barred. "When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State [and] not the county." Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988). In such a capacity, DA Brown is "entitled to invoke Eleventh Amendment immunity" from suit, which § 1983 does not override. Ying Jing Gan, 996 F.2d at 536; see Kentucky v.

Graham, 473 U.S. 159, 169 (1985). Further, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983," barring liability for that reason as well. Will v. Mich. Dep't of State Police, 491 U.S. 58, 65 (1989).

To state a claim under § 1983 against DA Brown in his individual capacity, plaintiffs must plead the DA's "personal involvement [in the] alleged constitutional deprivations." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). Plaintiffs specifically allege that, at a press conference held the evening of April 25, 2002, DA Brown stated "that he had full knowledge and supported the arrest and charges" of the Swintons. (AC ¶ 39.) Regardless of the truth of this allegation, DA Brown "is entitled to the same immunity defenses" which bar plaintiffs' Fourth Amendment claims against the ADAs. Ying Jing Gan, 996 F.2d at 536. Plaintiffs further allege, however, that DA Brown defamed the Swintons during a televised press conference held shortly after the Swintons' arrest. The Supreme Court has held that there is no absolute immunity for statements made during press conferences. See Buckley, 509 U.S. at 277-78 ("The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions."). Thus, DA Brown is entitled only to qualified immunity with respect to plaintiffs' § 1983 claim based on defamation.[6]

    iii.    City of New York.

Plaintiffs assert that the City is "liable under the doctrine of respondeat superior." (AC ¶ 73.) It is firmly established, however, that a municipality is liable for its employees' unconstitutional acts only when those acts result from a municipal custom or policy. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986); Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978). To state a § 1983 claim against a municipality, "[p]laintiffs must provide

---

[6] As discussed below, plaintiffs have failed to state such a claim.

9

more than conclusory allegations; they must add specific factual support to show the existence of a pattern." McCray v. City of New York, 2007 WL 4352748, at *27 (S.D.N.Y. 2007).

Plaintiffs declare that the Swintons' prosecutions resulted from a "recognized and established practice of unscrupulously inflating charges of defendants without just cause to secure convictions," (AC ¶ 66), that all defendants "have been the subject of prior civilian and departmental complaints of misconduct," (id. ¶ 86), and that the alleged constitutional violations "can only be the direct result of improper training and supervision," (Opp. at 28-29). These conclusory assertions do not state a plausible § 1983 claim against the City, especially in light of New York's requirement that a grand jury indict a potential criminal defendant on every charge to be tried based on a finding of probable cause. See Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (affirming that "the intervening exercise of independent judgment" by a grand jury that has not been "misled or coerced" will "break the chain of causation" under § 1983); City of Canton v. Harris, 489 U.S. 378, 385 (1989) (requiring "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Plaintiffs do not allege a municipal policy of fabricating evidence to mislead grand juries. Plaintiffs may not sidestep prosecutorial immunity, moreover, by reinventing their malicious prosecution claim as one alleging a failure properly to train ADAs not to commit malicious prosecution.[7]

Plaintiffs' § 1983 claim against the City likewise fails for the failure to plead facts suggesting the City's deliberate indifference to plaintiffs' constitutional rights. "[A] policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events." Walker, 974 F.2d at 297. Rather, "the given situation must occur so frequently as to be

---

[7] For the same reason, the Amended Complaint's allegations do not support DA Brown's potential liability as a "municipal policymaker." See Walker v. City of New York, 974 F.2d 293, 299-300 (2d Cir. 1992); Hewitt v. City of New York, 2011 WL 441689, *3 (E.D.N.Y. 2011) ("It would be illogical to treat the district attorney as a municipal policymaker for failure to train subordinates on the performance of a state prosecutorial function.").

a moral certainty." Mejia v. City of New York, 228 F. Supp. 2d 234, 248 (E.D.N.Y. 2002). The situation which police and prosecutors confronted in the Swintons' case – a baby's severe malnourishment caused by an improper vegan diet, along with the decision of which criminal charges, if any, to bring – was far from a routine occurrence.[8] "Failing to have a policy for this rare and unforeseen event thus cannot be deliberate indifference." Mejia, 228 F. Supp. 2d at 248.

    iv.    Detective Barry and unnamed police officers.

Consistent with established precedent, the parties agree that Detective Barry (along with other unnamed police officers) is entitled to qualified immunity, which "protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Gilles v. Repicky, 511 F.3d 239, 243 (2d Cir. 2007) (internal quotation marks omitted). The parties disagree over whether qualified immunity in fact shields Detective Barry and other officers from liability, a determination normally inappropriate for resolution at the Rule 12(b)(6) stage. The Court need not answer that question, however, since plaintiffs' claims fail for the reasons below.

    B.    <u>Federal claims.</u>

        i.    Section 1983.

"In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994). Additionally, "a state court judgment will have a preclusive effect on a subsequently filed § 1983 action where the § 1983 claims could have been raised in the state

---

[8] The extensive news coverage attending the Swintons' arrest confirms the situation's uniqueness. According to the Amended Complaint, to this day, an internet search of the incident returns thousands of relevant results. (AC ¶ 41 n.6.)

court action." Dyno v. Village of Johnson City, 240 F. App'x 432, 435 (2d Cir. 2007). Given these standards, and the amount of time that has passed since the Swintons' arrest and prosecution, the Amended Complaint does not state a viable § 1983 claim.

    a.  False arrest.

The Swintons were arrested on the evening of April 25, 2002, and arraigned the following day. Recovery for the Swintons' detention during this sliver of time, however, is barred by New York's three-year statute of limitations.

"Typically, a warrantless deprivation of liberty from the moment of arrest to the time of arraignment will find its analog in the tort of false arrest, while the tort of malicious prosecution will implicate post-arraignment deprivations of liberty." Singer v. Fulton County Sheriff, 63 F.3d 110, 117 (2d Cir. 1995). Thus, the limitations period for a false arrest claim begins "when the alleged false imprisonment ends," namely "once the victim becomes held pursuant to [legal] process – when, for example, he is bound over by a magistrate or arraigned on charges." Wallace v. Kato, 549 U.S. 384, 389 (2007). "The statute of limitations [for false arrest] is the three-year period for personal injury actions under New York State law." Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009). Although applying to file a late notice of claim tolls the limitations period under state law, Giblin v. Nassau County Med. Ctr., 61 N.Y.2d 67, 70 (1984), plaintiffs filed their application in October 2007, more than three years after their April 2002 arraignment. Thus, the Swintons' false arrest claims are untimely.

    b.  Malicious prosecution.

Plaintiffs' malicious prosecution claim is barred by the New York State court's denial of plaintiffs' application to file a late notice of claim. In the Second Circuit, "individual issues actually and necessarily decided in [an earlier] proceeding may be precluded by collateral

estoppel in subsequent § 1983 actions." Garden City Ctr. Assocs. v. Inc. Village of Garden City, 189 F.3d 460, 1999 WL 642784, at *3 n.1 (2d Cir. 1999) (table decision).

In June 2007, one year after the Swintons' release from prison, plaintiffs filed a notice of claim against the City as required by New York General Municipal Law Section 50-e. Like the Amended Complaint in this case, the notice "alleged false arrest, false imprisonment and malicious prosecution, and that [plaintiffs'] injuries included 'civil rights violations, loss of services, physical injuries, emotional injuries and other damages.'" Swinton III, 61 A.D.3d at 557-58. Because the statutory period in which to file the notice had elapsed, in October 2007, plaintiffs applied for leave to file a late notice.

Plaintiffs acknowledge that "the State Supreme Court ruled against plaintiffs' motion on the merits." (Sur-Reply Ltr., Dkt. #43, at 3.) Not reaching the timeliness issue, the Supreme Court (the Honorable Paul G. Feinman) found that "the criminal proceedings did not terminate in plaintiffs' favor" and that "implied in th[e] resolution of the criminal appeals is a finding that there was probable cause for the arrests." (Decision & Order, Dkt. #43-3. at 4.) Thus, the Supreme Court found that the "claims of false arrest, false imprisonment, and malicious prosecution cannot possibly be established." (Id.) The Appellate Division affirmed that "the finding of probable cause is fatal to each of the[se] causes of action," which "are not viable in light of petitioners' conviction of assault in the third degree." Swinton III, 61 A.D.3d at 558 (labeling plaintiffs' false arrest and malicious prosecution claims "'patently meritless'").

"[A] notice of claim is not required to assert a claim for civil rights violations," such as those brought under § 1983. Id. Thus, plaintiffs' § 1983 claims could not have been adjudicated during the notice-of-claim proceedings, a fact which arguably makes claim preclusion unavailable. "Under the doctrine of collateral estoppel, however, plaintiff should not be allowed

13

in [a § 1983] action to raise any of the issues he unsuccessfully litigated in his [earlier state] proceeding." Parker v. Blauvelt Volunteer Fire Co., Inc., 93 N.Y.2d 343, 349 (1999). Accordingly, if "the federal constitutional right . . . look[s] precisely like the state" right previously at issue, a plaintiff who loses in state court cannot seek a second chance to litigate under § 1983. McKithen v. Brown, 481 F.3d 89, 105-06 (2d Cir. 2007).

In the Amended Complaint, plaintiffs concede that "federal malicious prosecution claims are governed by state law." (AC ¶ 65 n.9.) "Because the same four elements must be proved for both the tort of malicious prosecution and the related section 1983 violation, the claims are virtually identical."[9] Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992) (quoting Raysor v. Port Auth., 768 F.2d 34, 39-40 (2d Cir. 1985)); see also Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010) ("In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff . . . must establish the elements of a malicious prosecution claim under state law."). In essence, Section 1983 grafts the state-law tort onto the Constitution, since the "right[], privilege[], or immunit[y] secured by the Constitution" is the right to be free from malicious prosecution by a state actor. See 42 U.S.C. § 1983; Singer, 63 F.3d at 116. And identically to the state claim, "the existence of probable cause is a complete defense to a claim of malicious prosecution" under § 1983. Savino v. City of New York, 331 F.3d 63, 72 (2d Cir.2003).

Plaintiffs contend that New York's Supreme Court and Appellate Division lacked the "requisite knowledge" or a "true understanding" of § 1983. (Sur-Reply Ltr. at 3.) To prove this point, plaintiffs cite federal cases relating to the issue of favorable termination, which "is not so much an element of a malicious prosecution claim as it is a prerequisite to commencement of the

---

[9] Similarly, "[t]he elements of a claim of false arrest under § 1983 are 'substantially the same' as the elements of a false arrest claim under New York law." Posr v. Doherty, 944 F.2d 91, 96 (2d Cir.1991) (quoting Raysor, 768 F.2d 34, 39-40 (2d Cir.1985).

action." Janetka v. Dabe, 892 F.2d 187, 189 (2d Cir. 1989) (allowing a convicted plaintiff to bring a malicious prosecution claim regarding an acquitted charge where "[t]he elements of each charge [we]re different" and, unlike here, "neither charge [wa]s a lesser included offense of the other"). Even had the Swintons' prosecution terminated favorably, an issue this Court need not revisit, the Swintons' malicious prosecution claim still would be barred due to the clear presence of probable cause.

Since the Swintons' arraignment in April 2002, a grand jury, a petit jury and at least five New York courts have found, explicitly or otherwise, that probable cause existed to arrest and prosecute the Swintons on the charge of first-degree assault.[10] Such an offense does not, as plaintiffs argue, "require[] direct intent to cause harm." (Opp. at 8.) Rather, the Swintons were convicted under New York Penal Law § 120.10(3), see Swinton I, 21 A.D.3d at 1040, which requires proof that a person "recklessly engage[] in conduct which creates a grave risk of death to another person" in "circumstances evincing a depraved indifference to human life." As the Court of Appeals recently explained in a different case, defendants' convictions here were

> based on the standard set forth in People v. Register, which, at the time of defendant[s'] trial, had not yet been explicitly overruled. The Register standard that 'depraved [indifference] murder is distinguishable from manslaughter, not by the mental element involved but by the objective circumstances in which the act occurs,' however, was explicitly overruled by People v. Feingold, where [the Court of Appeals] held for the first time that "depraved indifference to human life is a culpable mental state."

---

[10] The Appellate Division's dismissing the reckless endangerment count is a non-event, because "[a] verdict of guilty upon the greatest count submitted is deemed a dismissal of every lesser count submitted, but not an acquittal thereon." N.Y. C.P.L. § 300.40(3)(B); see People v. Cotton, 214 A.D.2d 994 (4th Dep't 1995) ("Reckless endangerment in the first degree is a lesser included offense of assault in the first degree." (citations omitted)). Similarly, plaintiffs' argument that ADA Rosenbaum "suppressed" grand jury testimony regarding the "facts [surrounding] plaintiffs' arrest," (Opp. at 12), does not vitiate the probable cause to arrest," Townes v. City of New York, 176 F.3d 138, 149 (2d Cir. 2007) (emphasis supplied).

15

People v. Prindle, — N.Y.3d —, 2011 WL 588430 (2011) (second alteration in original) (quoting Feingold, 7 N.Y.3d at 294). In other words, at the time of defendants' convictions, Penal Law Section 120.10(3) did not contain "a mens rea element beyond mere recklessness." People v. Register, 60 N.Y.2d 270, 278 (1983). In this case, the Court of Appeals found the evidence "legally sufficient . . . to support the jury's determination that defendants acted recklessly." Swinton II, 7 N.Y.3d at 777. Thus, the rule of law announced a day earlier in Feingold – that depraved indifference to human life is a culpable mental state – does not retroactively eliminate probable cause for the Swintons' arrest or prosecution under Penal Law § 120.10(3), notwithstanding the Court of Appeals's downgrading that conviction.

    c.  Unlawful search and seizure.

The Swintons concede that their own § 1983 claim for unlawful search and seizure is time barred. (AC ¶ 58 n.8.) Attempting to capitalize on Ice's infancy, which tolls the statute of limitations, the Amended Complaint alleges that Detective Barry and other officers' warrantless entry into the Swintons' Queens home violated Ice's Fourth Amendment rights. The parties agree that an individual invoking the Fourth Amendment's protection from warrantless searches "must demonstrate that he personally has an expectation of privacy in the place searched." Minnesota v. Carter, 525 U.S. 83, 88 (1998). Without citing any supporting authority, the parties disagree over whether an infant retains a legitimate privacy interest in her parents' home, assuming the infant originally had one, during an extended stay at the hospital. The Court need not decide this issue because the damages claimed on the infant's behalf cannot possibly flow from the government conduct alleged.

"A § 1983 action, like its state tort analogs, employs the principle of proximate causation." Townes, 176 F.3d at 148 (holding that a "gross disconnect" between an alleged

Fourth Amendment violation and the damages sought will defeat a § 1983 claim as a matter of law). Although "the abstract value of a constitutional right may not form the basis for § 1983 damages," Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986), "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy," Townes, 176 F.3d at 148. Here, plaintiffs allege that Detective Barry and other officers entered and searched the Swintons' home absent a warrant or voluntary consent, intentionally causing Ice while in the hospital "to suffer physical and emotional distress." (AC ¶ 57.) The notion that Ice somehow suffered this type of damage from the alleged warrantless search defies logic, since Detective Barry, like the EMTs months earlier, entered the Swintons' home as part of a course of conduct designed to rescue Ice from the documented physical (and likely emotional) distress from which the malnourished infant already suffered.[11]

As the Second Circuit has made clear, Ice's "only possible damage claim would be limited to the brief invasion of privacy related to the" officers' warrantless entry. Townes, 176 F.3d at 149. The Amended Complaint requests no such damages, which would likely be nominal; instead, plaintiffs request $10 million in combined compensatory and punitive damages for the "specific and serious physical and emotional pain, harm and suffering" that defendants' conduct allegedly "was designed to" inflict upon Ice. (AC ¶ 57.) Given the "gross disconnect" between alleged violation and injury, Townes, 176 F.3d at 148, the infant fails to state a plausible illegal search claim under § 1983.

---

[11] The Court assumes, as it must, the truth of the allegation that Detective Barry and other officers "searched the premises" before "demand[ing] that the child be produced," (AC ¶ 33), notwithstanding the obvious fact that a call to ACS might have informed defendants that Ice remained in the hospital on the date of the Swintons' arrest.

17

d.  Defamation.

According to the Amended Complaint, the Swintons' due process rights were infringed when DA Brown, at a post-arrest press conference, "knowing and wrongfully displayed their likeness in the media" and "made false and defamatory statements about them," (AC ¶ 91), including characterizing the Swintons as "monsters," (id. ¶ 42). "Generally, defamation is an issue of state, not of federal constitutional, law." Vega v. Lantz, 596 F.3d 77, 81 (2d Cir. 2010). Nonetheless, a plaintiff may state a "stigma plus" claim under § 1983 by alleging both: "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2007) (internal quotation marks omitted).

The Amended Complaint asserts that, at the April 2002 press conference, "the Swintons were portrayed as being guilty" of crimes more serious than those they committed. (AC ¶ 43.) The Swintons, however, have "not alleged that the conduct underlying [their] conviction for assault," regardless of the offense level, "did not occur." Vega, 596 F.3d at 82. Thus, plaintiffs have "not established a threshold requirement – the existence of a reputation-tarnishing statement that is false." Id. (dismissing "stigma plus" claim based on the plaintiff's classification as a sex offender despite acquittal of most serious charge); cf. Valmonte v. Bane, 18 F.3d 992, 997 (2d Cir. 1994) (holding that a plaintiff's inclusion on a child abuse registry despite the fact that child protective proceedings were dismissed supported a "stigma plus" claim for injunctive relief).

"Even assuming, arguendo, that defendants' public statements about plaintiffs amounted to defamation, plaintiffs have failed to allege the additional state-imposed burden necessary for invoking the 'stigma plus' doctrine." Sadallah, 383 F.3d at 38. Plaintiffs allege that they feel the

18

"ramifications" of their prosecution "when people call them 'monsters' and 'child abusers,' on the street and in the work place," (AC ¶ 97), and that this has hampered the Swintons' "ability to find gainful and successful employment and enrollment in classes and courses to advance their education and training," (id. ¶ 98). Assuming that these results are somehow attribute to the press conference, the generalized ill effects claimed by the Swintons represent "the normal repercussions of a poor reputation," which are not compensable under § 1983. Valmonte, 18 F.3d at 1001 (requiring a plaintiff to show that the defamation placed a "tangible burden on her employment prospects"); see also Siegert v. Gilley, 500 U.S. 226, 234 (1991) ("[S]o long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a [federal] action.").

        ii.      Equal Protection.

The Amended Complaint includes a number of vague references to equal protection. (See AC ¶¶ 1, 61, 91.) Because plaintiffs have not alleged that the government's conduct "involve[d] a suspect classification or impinge[d] on a fundamental right, it need survive only rational basis scrutiny.'" United States v. Thomas, 628 F.3d 64, 66 (2d Cir. 2010) (quoting Griffin v. Mann, 156 F.3d 288, 291 (2d Cir. 1998)). The Swintons have not attempted to show that their prosecution was irrational, nor could they; thus, any equal protection claim fails.[12]

    C.    State-law claims.

The failure to file a timely notice of claim against the City bars plaintiffs' state-law tort claims. See Hardy v. New York City Health & Hosps. Corp., 164 F.3d 789, 793 (2d Cir. 1999) ("[I]n a federal court, state notice-of-claim statutes apply to state-law claims."); Maloney v. County of Nassau, 623 F. Supp. 2d 277, 291 (E.D.N.Y. 2007) ("[N]otice of claim requirements

---

[12] For these same reasons, plaintiffs have not stated claims for conspiracy under 42 U.S.C. §§ 1985 or 1986.

apply equally to state tort claims brought as pendent claims in a federal civil rights action."
(internal quotation marks omitted)). Federal district courts lack jurisdiction to hear applications
to file late notices of claim. See Henneberger v. County of Nassau, 465 F. Supp. 176, 201
(E.D.N.Y. 2006) (citing N.Y. Gen. Mun. Law § 50-e(7)). And New York's Appellate Division
already has affirmed the trial court's denial of plaintiffs' application to file a late notice.
Swinton III, 61 A.D.3d at 557.

## Conclusion

For the reasons given above, plaintiffs do not state a viable § 1983 claim. Therefore, the
Court dismisses plaintiffs' Amended Complaint with prejudice.


SO ORDERED.

Dated: Brooklyn, New York
      March 18, 2011                               s/ Judge Raymond J. Dearie

                                                           RAYMOND J. DEARIE
                                                           United States District Judge